J-S50011-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 589 EDA 2020 |

Appeal from the Decree Entered January 29, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000393-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: A.I.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.W., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 590 EDA 2020 |

Appeal from the Order Entered January 29, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0003011-2017

BEFORE:   BENDER, P.J.E., SHOGAN, J., and STRASSBURGER, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    Filed: January 21, 2021

K.W. ("Mother") appeals from the decree and order, both dated January 29, 2020, that granted the petitions filed by the Philadelphia Department of Human Services ("DHS") to involuntarily terminate Mother's parental rights to A.I.M.W. ("Child") (born in August 2014) pursuant to Sections 2511(a)(2),

_____

[*] Retired Senior Judge assigned to the Superior Court.

(5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and to change the permanency goal from reunification to adoption under the Juvenile Act, 42 Pa.C.S. § 6351.[1]  We affirm.

The trial court summarized the facts and relevant history as follows:

DHS originally became involved with this family on November 9, 2016, when DHS received a General Protective Services ("GPS") report alleging that the family home's gas and water utility services were disconnected; the family used the microwave to cook; Mother had a learning disability; and Maternal Grandmother, who also resided in the home, had serious substance abuse issues.  This report was determined to be valid. On December 21, 2016, Community Umbrella Agency ("CUA") Wordsworth implemented in[-]home services.  On December 23, 2016, DHS visited the home of Maternal Cousin and determined the home was appropriate.  Child was residing with Maternal Cousin until necessary repairs could be made to the family home. On December 29, 2016, CUA visited the family home and determined that it was still inappropriate because the utilities were still disconnected and there was significant structural damage to the home.  On January 5, 2017, CUA visited Mother's home.  CUA discovered that[,] although the home had electricity, Maternal Grandmother would use one lamp, [and] moved from room to room, to have light.  CUA also discovered that the home was extremely cold and had no running water.  Maternal Grandmother indicated that the home did not have any plumbing for two years.

On January 10, 2017, CUA held the initial single case plan ("SCP") meeting.  Child's goal was identified as "stabilize family."  Mother's objectives were to address safety issues and ensure Child's basic daily needs were met; apply for food stamps and cash assistance; ensure Child attend[ed] scheduled appointments with her primary care physician ("PCP") and neurologist; continue to follow the safety plan; and explore alternative housing options.  On January 11, 2017, Mother and Maternal Cousin signed a safety plan for

---

[1] On January 29, 2019, the trial court involuntarily terminated the parental rights to any unknown fathers to Child.  **See** N.T., 1/29/20, at 22.  During the pendency of the case, no father was named or appeared, and no father is listed on Child's birth certificate.  **Id.**

[C]hild, which stipulated that Child would remain in Maternal Cousin's care until the safety threats were eliminated from the home.

On February 7, 2017, CUA visited Mother's home. Maternal Grandmother stated that she had spoken to a neighbor ("Neighbor") who worked [for] Habitat for Humanity[,] and Neighbor agreed to work on Mother's home with some volunteers for a discounted rate. Maternal Grandmother also stated that she would continue to search for low-income housing. On February 16, 2017, Maternal Grandmother stated that Neighbor and his crew would start working on the home the following week and that she was receiving Social Security benefits. CUA informed Mother, Maternal Grandmother, and Maternal Cousin that Child could not reside in the family home until the home was repaired. CUA also indicated that when Child was ready for school, someone would have to ensure that all necessary documents were signed, and that Child attended medical and dental appointments on a consistent basis. Maternal Cousin stated that she would be willing to sign all necessary documents for Child because Mother did not read well or understand what the documents stated. Mother agreed to the arrangement.

On April 10, 2017, CUA discovered that the necessary repairs to the home were not completed. On May 22, 2017, CUA discovered that the roof of the family home had collapsed. On May 22, 2017, Maternal Cousin indicated that Mother and Maternal Grandmother returned to family home because they were not contributing to Maternal Cousin's household, although Child remained with Maternal Cousin. Maternal Cousin also indicated that Mother had not returned to visit with Child or call[ed] to see how Child was doing. On June 9, 2017, CUA spoke with Maternal Cousin about kinship care for Child due to the ongoing issues with the family home. On July 12, 2017, Mother was informed that Maternal Cousin could not receive kinship care benefits because Maternal Cousin did not own or rent the home where she was residing. On August 3, 2017, Maternal Cousin signed another safety plan that indicated that Child would temporarily reside with Maternal Cousin and that she would ensure Child's medical needs were met. On September 15, 2017, CUA visited Maternal Cousin's home. CUA discovered the home had a hole in the ceiling and mold. Maternal Cousin indicated that she did not know how to work with Child because she cried all the time; she was not prepared to care for Child on a long-term basis; and she wanted to know when Child

could return to Mother's care. CUA indicated that Child could not return to Mother's care until the home was repaired and had operable utilities. Maternal Cousin indicated that Mother would not visit Child and on the occasions that she did, Mother would watch television and not engage with Child.

On October 20, 2017, DHS attempted to obtain an Order of Protective Custody ("OPC") for Child, due to a "family arrangement that failed." Child had resided in Maternal Cousin's home for approximately ten months and Maternal Cousin indicated that she was unable to care for Child on a long-term basis. A family group decision making meeting was held for Child and it had been determined that no one else in the family was able to care for Child. Maternal Cousin agreed to care for Child until a placement was identified. This OPC was denied.

On October 26, 2017, the SCP was revised. Mother's objective[s] were to address Child's safety issues and ensure Child's basic daily needs were met; ensure Child attended scheduled appointments with her PCP; ensure Child attend[ed] all specialist appointments, including neurology, audiology, and genetics at Children's Hospital of Pennsylvania and comply with recommendations; explore alternative housing options; visit and interact with Child at least once per week; comply with services; attend parenting education classes at the Achieving Reunification Center ("ARC"); and comply [sic] an intelligence quotient ("IQ") assessment.

On November 13, 2017, DHS filed a dependency petition for Child, citing the ongoing issues regarding the family home. On December 6, 2017, Child was adjudicated dependent based on present inability to provide proper parental care and control. Maternal Cousin was awarded temporary legal custody of Child. The trial court ordered DHS to supervise and to obtain an OPC for Child once an appropriate placement for Child was located; Mother be referred to the Behavioral Health System ("BHS") for a psychological evaluation and IQ testing; Mother be referred to the ARC for appropriate services; Child be referred for an evaluation for autism; and Mother attend supervised visits at the [A]gency with twenty-four[-]hour confirmation. Subsequently, DHS was unable to locate an appropriate placement for Child.

On February 26, 2018, DHS received a Child Protective Services ("CPS") report alleging that Maternal Cousin had hit Child on her buttocks with a belt; Child had a large mark on her buttocks that

appeared fresh and was bleeding; Child's underwear was adhered to her injury; Child stated that her injury "hurt"; Child stated that she did not want to return to Maternal Cousin's care; and Child was undergoing genetic testing for hearing loss. This report was indicated. On February 27, 2018, DHS visited Maternal Cousin's home to investigate the allegations of the CPS report, but no one was home. DHS left a notification letter requesting Maternal Cousin to contact DHS. On February 28, 2018, DHS visited Child's daycare center and spoke with staff, who stated that they were unaware of any injuries to Child. A staff member subsequently escorted Child to the restroom and observed that she had a large square bandage on her buttocks. Child indicated to DHS that Maternal Cousin had hit her with the belt but denied that she was afraid to return to Maternal Cousin's home. On that same date, DHS visited Maternal Cousin's home. Maternal Cousin indicated that while she was bathing Child, Child had a bowel movement in the bathtub; when she removed Child from the bathtub and began cleaning Child, Child had another bowel movement; and she hit Child on her buttocks and legs with a belt. DHS also observed that the home's roof had a significant leak that appeared to be an ongoing issue. On that same date, DHS obtained an OPC for Child and placed her in foster care.

On March 2, 2018, a shelter care hearing was held for Child. Mother was not present for this hearing. The trial court lifted the OPC, discharged the temporary commitment to DHS, and fully committed Child to DHS.

Trial Court Opinion ("TCO"), 5/14/20, at 1-4 (footnotes omitted).

Permanency review hearings were held in March 2018, May 2018, June 2018, and October 2018. During this time, Mother was referred to ARC but, following an initial intake, her status was changed to inactive in April 2018 and closed in May 2018 due to non-participation. *Id.* at 5. In June 2018, Mother was enrolled in individual services and receiving income through Social Security, but the court ordered that Mother re-engage with the Community Council for mental health; CUA follow up with intellectual disability services (IDS) for Mother; and that Mother attend weekly supervised visits with Child.

*Id.* In October 2018, Mother was again referred to BHS and ordered to re-engage with ARC; Mother was also ordered to attend family school and receive a referral for a parenting capacity evaluation ("PCE"). *Id.*

On December 17, 2018, the SCP was revised and an alternate/concurrent goal of adoption was identified for Child. *Id.* at 6. Mother was additionally ordered to address her mental health and participate with Community Council, complete a PCE, and comply with the recommendations of that evaluation. *Id.*

Two additional permanency review hearings were held in December 2018 and March 2019. *Id.* At the December hearing, Mother was moderately compliant with the permanency plan, but she was re-referred for a PCE and to BHS for monitoring. *Id.* Mother was to begin family school and attend weekly supervised visits with Child, and her therapist was to provide the court with Mother's treatment plan and progress report. *Id.*

In March 2019, the court determined that Mother was minimally compliant with the permanency plan. Mother was again ordered to engage in mental health services with BHS to monitor Mother. Mother was to provide verification of SSI, attend a second visit at family school, attend Child's medical appointments, and be referred to ARC for housing. *Id.* CUA was to follow up with the Division of Intellectual Disability Services ("IDS") and with Mother's PCE date. *Id.* DHS was to explore voluntary relinquishment of parental rights with Mother. *Id.*

On May 29, 2019, DHS filed petitions seeking to involuntarily terminate Mother's parental rights and to change Child's permanency goal from reunification to adoption. Prior to the termination hearing, the court conducted three additional permanency review hearings in June 2019, August 2019, and December 2019. *Id.* at 6-7. At each hearing, Mother was referred to BHS for consultation and/or evaluation; to reconnect with services at Community Council; and to continue supervised visitation. *Id.*

On January 29, 2020, the court conducted a termination and goal change hearing. Mother was not present for the hearing.[2] DHS presented the testimony of Joshua Decker, the CUA Turning Points for Children case manager, and D.T., Child's foster mother.[3]

At the conclusion of testimony, the court entered its decree terminating Mother's parental rights to Child, pursuant to Sections 2511(a)(2), (5), (8), and (b) of the Adoption Act, and its order changing Child's permanency goal to adoption pursuant to Section 6351 of the Juvenile Act. Mother filed two timely notices of appeal and two Pa.R.A.P. 1925(b) statements of errors complained of on appeal.[4]

_____

[2] Mother was present for the December 3, 2019 permanency review hearing and CUA had contact with her in the week prior to the hearing, and there had been no issues as to service. *See* N.T., 1/29/20, at 4.

[3] Child's legal interests were represented by Attorney Tracey Chambers Coleman, who determined that Child did not understand adoption, but was very engaged with her foster family. *See* N.T., 1/29/20, at 33, 43.

[4] This Court entered an order consolidating the two appeals *sua sponte* on March 9, 2020.

Mother now presents the following issues for our review:

1. Whether the trial court abused its discretion and erred as a matter of law in terminating [Mother's] rights when DHS failed to meet its burden that termination of parental rights was warranted under 23 Pa.C.S. 2511(a) and (b) and the judge's decision was not supported by competent evidence[?]

2. Whether the trial court abused its discretion and erred as a matter of law in changing the permanency goal from reunification as there was not competent evidence that it was in the best interests of the child[?]

*See* Mother's Brief at 8.

We review an order terminating parental rights in accordance with the following standard:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (*quoting In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (*quoting In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)). The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts in the evidence. ***In re M.G.***, 855 A.2d 68, 73-74 (Pa. Super. 2004). If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003).

The first of Mother's issues pertains to Section 2511 of the Adoption Act, which governs the termination of parental rights and requires a bifurcated analysis. In addressing her claims, we are guided by the following:

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. ***R.N.J.***, 985 A.2d at 276.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, the trial court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[ ] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Relative to Section 2511(a)(2), Mother argues that DHS did not meet its burden of proof because she was active in her visitation; attended visits regularly; and the quality of the visits were good.  *See* Mother's Brief at 18.

Further, Mother argues that she attended therapy consistently; had completed family school "one time," did not use drugs, and attended her "ID evaluation" [sic] and mental health evaluation. *Id.* Mother admits that she did not undergo a PCE, but contends this was not her fault, as she was not properly referred. *Id.* Accordingly, Mother argues there was no objective evidence of her incapacity to parent. *Id.*

The trial court addressed the facts it found relating to subsection 2511(a)(2), stating:

> Mother's SCP objectives were mental health, housing, parenting, attend Child's medical appointments, complete an IQ test, engage with IDS, attend family school, and complete a PCE. Mother signed the SCPs when they were revised and attended the permanency review hearings through the life of the case, so Mother was aware of her objectives. Recently, Mother has consistently attended therapy through Community Council.
>
> Mother does not have a home that is appropriate or safe for reunification with Child. Mother is currently residing in the same home that was of concern when this case was first opened. One of the primary reasons that brought Child into DHS care was inadequate housing. CUA visited Mother's home on January 7, 2020, and found that the home had a strong smell of urine, paint was falling off of the walls, cluttered, and there was no running water or gas. Housing has been an ongoing problem throughout the life of this case . . . [and t]hose concerns have not been remedied. At times, Mother has made some small repairs to the home, but the repairs were not enough to make the home appropriate or safe. Although Mother was referred to ARC for housing, Mother did not complete the program. To date, Mother has not completed any type of housing program. When CUA speaks with Mother regarding the ongoing housing issues, Mother will state that she will address them in the near future, but the matters are never resolved.
>
> Mother has not completed any parenting programs. Mother was referred to the ARC for parenting, but Mother did not complete the

program. For approximately two years, Mother has not attended any of Child's PCP or specialist appointments. DHS did inform Mother of the appointments in advance, either in person or via text message.

Mother completed an IQ test, as part of a psychological evaluation, on December 12, 2017. Mother was found to have an IQ level of 65, which was in the first percentile and considered an "extremely low" range of intellectual functioning. Mother's low IQ classifies her as having an intellectual disability. Based on Mother's results, Mother was referred for IDS on December 18, 2018, but Mother was a no call-no show for her scheduled intake appointment on March 13, 2019. To date, Mother has never engaged with IDS, even though CUA speaks to Mother about engaging on a regular basis.

Throughout the life of the case, Mother was referred to family school on multiple occasions. Mother first attended family school during the summer of 2019 and was discharged from the program in August 2019 after Mother attended approximately half of the scheduled program. Mother was most recently referred to family school on December 2, 2019. Mother attended the intake appointment at family school on December 20, 2019, but was discharged on January 27, 2020. After Mother completed the intake appointment, she failed to engage with the program within thirty days after completing the intake appointment. Mother was referred to complete a PCE on October 4, 2019. To date, Mother has failed to complete the PCE.

In addition to Mother's objectives, Mother is offered weekly supervision with Child at the agency. Since August 2019, Mother has attended approximately fifty percent of the visits. Since November 2019, Mother attended six out of the eleven offered visits with Child. For the life of the case, Mother has not graduated beyond supervised visits with Child. While Child is transported to the supervised visits, Child would cry and indicate that she did not want to go. After the visits, Child was observed being withdrawn and quiet. In recent months, Child has not asked to see Mother.

Mother is minimally compliant with her SCP objectives. Mother's progress towards alleviating Child's need for placement is minimal. Mother's inappropriate housing and failure to address her intellectual disability remain the biggest barriers to reunification with Child. Child needs permanency, which Mother

is unable to provide. The conditions and causes of Mother's incapacity, which have existed for the life of the case, cannot or will not be remedied by Mother. Mother is not capable of providing stability to Child. At the time of the termination and goal change trial, Child had been in DHS care for approximately twenty-five months. Mother has attended multiple court hearings throughout the life of the case and CUA communicated Mother's SCP objectives to her, so she was aware of her objectives. Mother was given ample opportunity to put herself in a position to parent, but Mother has failed to do so. Mother's repeated and continued incapacity has not been mitigated. The DHS witnesses were credible. Mother has demonstrated that she is unwilling to remedy the causes of her incapacity in order to provide Child with essential parental care, control, or subsistence necessary for her physical and mental well-being.

TCO at 8-10 (citations to N.T. omitted, paragraph breaks added).

Having reviewed the record, we conclude that it supports the findings of the trial court that Mother has not, and cannot, provide Child with the essential parental care, control and subsistence necessary for her mental and physical well-being, and that Mother is unable to remedy the causes of her parental incapacity, neglect or refusal. While the trial court noted that Mother had irregularly visited with Child and had begun attending therapy, it is clear that Mother will not, or cannot, become a capable parent for Child at any point in the foreseeable future. It is evident that it is not because Mother has an intellectual disability, but because she has not tried to remedy her problem by attending IDS. As the trial court found, "Mother has never engaged with IDS, even though CUA speaks to Mother about engaging on a regular basis." TCO at 9. Thus, we conclude that DHS has carried its burden of proving the statutory grounds for termination under Section 2511(a)(2). Therefore, Mother is not entitled to relief.

- 14 -

Having resolved that grounds for termination existed under Section 2511(a)(2), we now proceed to the second part of the analysis under subsection (b). In reviewing the evidence in support of termination under Section 2511(b), our Supreme Court stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "intangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [620 A.2d 481, 485 (Pa. 1992)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). With respect to the bond analysis pursuant to Section 2511(b), the Court explained, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition." *Id.* "Common sense dictates that courts considering termination must also consider whether the children are in a preadoptive home and whether they have a bond with their foster parents." *Id.* at 268 (citation omitted). Moreover, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind. Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail, … the result, all too often, is catastrophically maladjusted children." *Id.*

Mother argues that the court erred in finding grounds for termination pursuant to Section 2511(b) because Mother and Child shared a bond, and the CUA case manager erred in quantifying the bond as "not a maternal bond." *See* Mother's Brief at 22. Mother contends vaguely that "there was enough indication that a bond existed that would be broken" and, accordingly, the court should not have terminated her parental rights to Child. *Id.*

The record supports the trial court's decision to terminate Mother's parental rights pursuant to this section. In its opinion, the trial court re-emphasized that Mother did not complete her family school objectives; attended only fifty percent of the visits offered since August 2019; and had not graduated beyond supervised visits. *See* TCO at 17. Further, Child would cry and indicate she did not want to go to visit Mother; was withdrawn and quiet afterward; and did not ask to see Mother in recent months. *Id.* The court further observed:

> Child currently resides in a pre-adoptive foster home. Child has lived in this foster home for approximately two years with the foster mother, the foster father, the foster family's biological daughter, and an adopted daughter. The adopted daughter is five-years-old, the same age as Child. When Child was initially placed in the foster home, Child was significantly underweight, malnourished, and sick. Child suffered from untreated chronic ear infections, a heart condition, and appeared non-verbal.
>
> Since Child was placed in the foster home, Child has received the necessary medical care to address her medical needs. Child has been diagnosed with long QT syndrome, a heart rhythm condition. Child now regularly attends follow ups with her cardiologist and is properly monitored. Child has also received surgery to address her hearing impairment caused by Child's untreated chronic ear infections.

Child also exhibits trauma-related behavioral concerns, including food insecurity and attention seeking behavior. The foster parent has ensured that Child receives therapy and has shown progress throughout her placement. Child is currently enrolled in early intervention, speech therapy twice per week, physical therapy, occupational therapy, and special education services. Child refers [to] the foster parent as "mom-mom" or "mom." Child looks to the foster parent for care, comfort and to meet all her needs. Child shares her primary parent-child relationship with the foster parent. Child also has a close relationship with the adopted child in the home. Child would experience hardship if she were removed from her current foster home. Child has expressed that she does not wish to return to Mother's care but wants to return to the care of the foster parent.

For approximately two years, Mother has not attended any of Child's PCP or specialist appointments. DHS did inform Mother of the appointments in advance, either in person or via text message. At the time of the termination trial, Mother was not meeting any of Child's medical needs. Mother was not providing Child with safety, stability, care, or comfort. Mother's relationship with Child resembled a sibling relationship or a relationship a child would have with an extended relative. Although Child does recognize Mother and has a relationship with her, Child's relationship with Mother does not reflect a parent-child relationship. Child does not look to Mother [as] her caregiver. Mother is not capable of providing stability to Child. It is in Child's best interest to terminate Mother's parental rights and Child would not suffer any irreparable harm if Mother's rights were terminated.

TCO at 18-24 (citations to N.T. omitted, paragraph breaks added).

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of a parental bond with Mother, we discern no error or abuse of discretion in its determinations under Section 2511(b). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Accordingly, we affirm the decree terminating Mother's parental rights to Child.

- 17 -

Finally, Mother argues that the court erred in changing Child's permanency goal from reunification to adoption because there was not competent evidence that the best interests of the Child were considered. *See* Mother's Brief at 24.

This Court's standard of review involving a goal change for a dependent child is as follows:

> In cases involving a court's order changing the placement goal … to adoption, our standard of review is abuse of discretion. *In re N.C.*, 909 A.2d 818, 822 (Pa. Super. 2006). To hold that the trial court abused its discretion, we must determine its judgment was "manifestly unreasonable," that the court disregarded the law, or that its action was "a result of partiality, prejudice, bias or ill will." *Id.* (*quoting In re G.P.-R.*, 851 A.2d 967, 973 (Pa. Super. 2004)). While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a "responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record." *In re A.K.*, 906 A.2d 596, 599 (Pa. Super. 2006). Therefore, our scope of review is broad. *Id.*

*In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008).

Pursuant to the Juvenile Act, 42 Pa.C.S. § 6351(f), when considering a petition for goal change for a dependent child, the juvenile court is to consider, inter alia: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the child; and (5) a likely date by which the goal for the child might be achieved. *In re S.B.*, 943 A.2d at 977. The best

interests of the child, and not the interests of the parent, must guide the trial court. *Id.* at 978.

Mother's argument regarding the goal change, and the trial court's discussion of the issue, rely on many of the same facts and arguments as the discussion of the termination. We do not disturb the goal change order. Indeed, Child's best interests are served by a goal change to adoption. During twenty-five months that Child was in care, Mother had made minimal progress towards reunification, had not completed her SCP objectives, and was minimally compliant with those objectives. Child is living in a pre-adoptive foster home where she is thriving, attending therapy and early intervention services, and receiving the appropriate medical care for her serious health issues. The court found that there is no realistic timeline where Child may be safely reunified with Mother. *See* TCO at 22. Accordingly, Child's best interests are served by a goal change to adoption.

Decree affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/21/21